**DEPARTMENT OF COMMUNITY AND REGIONAL AFFAIRS, STATE of ALASKA, Appellant,**

v.

**SISTERS OF PROVIDENCE IN WASHINGTON, Appellee.**

**No. S–2007.**

Supreme Court of Alaska.

April 1, 1988.

Virginia B. Ragle, Asst. Atty. Gen. and Grace Berg Schaible, Atty. Gen., Juneau, for appellant.

Susan Wright Mason, Atkinson, Conway & Gagnon, Anchorage, for appellee.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

At issue in this case is whether the State must grant a subsidy to the Sisters of Providence for a construction project at Providence Hospital in Anchorage. The law providing for such subsidies, AS 29.90, was repealed on July 26, 1983. Providence did not apply for the aid until Sept. 20, 1985, more than two years after the effective date of repeal. However, the repeal included a grandfather clause which provided that those "receiving or entitled to receive" the subsidy prior to the repeal would continue to do so. Ch. 95, § 9, SLA 1983, Temporary and Special Acts. The question is whether Providence was "entitled to receive" the construction funding prior to July 26, 1983.

The Department of Community and Regional Affairs ("DCRA"), the agency responsible for administering the program, denied Providence's application. The superior court reversed. We reverse the superior court's decision.

I.

### A. State aid for hospital construction

To be eligible to receive a construction subsidy under AS 29.90, a hospital had to meet four requirements: (1) The hospital had to be licensed by the Department of Health and Social Services as a "general hospital." (2) The hospital could not be operated or wholly supported by the state or federal government. (3) Construction must have begun after January 1, 1968. (4) State matching aid could not have constituted 25% or more of the total project cost. AS 29.90.010, .030(2).

The amount payable each fiscal year to the sponsor of a qualifying construction project was $2,500 per bed, "or five percent of the total project cost, whichever is greater." AS 29.90.010. The total amount payable was 25% of the total project cost, when combined with state matching funds. *Id.* The statute also provided that if insufficient funds were allocated to the program, the available amount would be distributed pro-rata. AS 29.90.020.

This construction aid program was repealed, effective July 26, 1983. Ch. 95, § 10, SLA 1983. The repealing legislation contained a grandfather clause:

The sponsor of a hospital or health facility construction project who is receiving or *entitled to receive* state aid under AS 29.90 on the day preceding [the effective date of this] Act shall continue to receive state aid until the sponsor has received an amount which, combined with state matching money for construction of the hospital or health facility, equals 25 percent of the total project cost.

Ch. 95, § 9, SLA 1983, Temporary and Special Acts (emphasis added). The heart of this case is the correct interpretation of the words "entitled to receive" in the repealing legislation.

### B. Providence's application for aid

On May 2, 1983, twelve weeks before the repeal of the subsidy program, the Department of Health and Social Services granted a certificate of need for a major expansion of Providence Hospital in Anchorage.[1] The

---

1. By statute, a certificate of need was required for any hospital construction or alteration. Ch.

275, § 2, SLA 1983. This was amended in 1983

certificate was challenged by Dr. Michael Beirne and the Lake Otis Clinic, Inc. The challenge, vigorously opposed by the State and Providence, was finally defeated in this court on September 16, 1985.[2]

Notwithstanding the dispute over the certificate, Providence began substantial construction on the project.[3] Yet Providence inexplicably failed to apply for state aid, to which it otherwise might have been entitled, until September 20, 1985.[4] On the application, the cost of the project was budgeted at over $139,000,000; the claimed yearly entitlement, at 5% of the total, was just under $7,000,000.

Upon receiving the application in 1985, the DCRA hired an accounting firm to audit the project to determine whether construction actually began prior to July 26, 1983, the date AS 29.90 was repealed. The auditors' report concluded that Providence spent $209,860 on the project prior to July 26, 1983, primarily on purchasing and moving trailers to the site.[5] After considering this report, along with Providence's brief and an attorney general's opinion on Providence's eligibility, the Division of Municipal and Regional Assistance of the DCRA rejected Providence's application. Providence appealed to the DCRA Commissioner, who upheld the Division's determination.

Providence then appealed to the superior court. The court reversed, finding that Providence's application had been timely, and that Providence's pre-repeal expenditures were a proper basis for AS 29.90 funding. DCRA now brings this appeal.

## II.

■ The legislation repealing AS 29.90 states that those who were "entitled to receive" funding prior to July 26, 1983

would "continue to receive" it. Ch. 95, § 9, SLA 1983, Temporary and Special Acts. The correct interpretation of "entitled" is purely a matter of law. The resolution of this question does not require agency expertise. Under these circumstances, this court must exercise its independent judgment in reviewing this matter. *Kjarstad v. State*, 703 P.2d 1167, 1170 (Alaska 1985); *State v. Aleut Corp.*, 541 P.2d 730, 736–37 n. 15 (Alaska 1975).

### A. Common usage

■ Alaska's statute governing statutory construction states:

> Words and phrases shall be construed according to ... their common and approved usage. Technical words and phrases and those which have acquired a peculiar and appropriate meaning, whether by legislative definition or otherwise, shall be construed according to the peculiar and appropriate meaning.

AS 01.10.040. This statute describes two different approaches to interpretation, depending on whether the usage of a word is common or technical. However, we think common usage and technical usage of "entitled" are the same, at least in the context of statutory entitlements.

■ Providence strenuously argues that "entitled" is synonymous with "eligible." That view is erroneous. To be *eligible* for a statutory benefit, one must meet the basic statutory requirements, such as age, occupation, or disability. But to become *entitled* to a statutory benefit, one must at least submit an application, if not also run the gauntlet of administrative hearings and have the application accepted.

In Black's Law Dictionary, the first definition of "entitle" is as follows: "In its

---

to apply only to projects costing over $1,000,000. AS 18.07.031.

2. See *Beirne v. Smith*, 704 P.2d 786 (Alaska 1985), *petition for reh'g denied* (Sept. 16, 1985) (*per curiam* order).

3. By mid-June of 1985, Providence had spent about $35 million on the project.

4. At the very least, even if Providence could now collect the subsidy, the hospital would have

lost over two years of interest on its entitlement. On a claimed entitlement of about $7 million per year, the lost interest would probably be over a million dollars. This inexplicable forfeiture could be seen as a sign that Providence itself did not believe it had a valid claim.

5. $209,860 is less than two-tenths of one percent of the total project cost of $139,000,000.

usual sense, to entitle is to give a right or legal title to." [6] *Black's Law Dictionary* 477 (5th ed. 1979). The first definition for "eligible" is "[f]it and proper to be chosen." *Id.* at 467. This comports precisely with common usage. Although Providence may have been *eligible* for funding if construction actually started before July 26, 1983, Providence was not then *entitled* to the money. If Providence had sued for the funds at that time without first having submitted an application, it would not have gotten very far.

### B. Legislative intent

This court's primary role in defining "entitled" is to determine the legislature's intent. *See, e.g., Alaska Commercial Fishing & Agric. Bank v. O/S Alaska Coast,* 715 P.2d 707, 713 (Alaska 1986). However, here that intent is quite ambiguous.

Senator Josephson, a member of the Senate Finance Committee, proposed the grandfather clause as an amendment to the legislation repealing AS 29.90. In June of 1983, in a Finance Committee discussion of the grandfather clause, Senator Josephson made the following remarks: "It's a grandfather amendment for what is already in the construction pipeline.... [T]he repeal is prospective only to projects not committed to." *Both* parties rely on this language to support their respective positions. Providence argues that the language refers to projects already commenced, regardless of whether the sponsor had applied for aid. But, equally plausibly, the DCRA argues that the language refers only to projects to which the State had already committed funds.

To bolster its interpretation, Providence offered a letter written by Senator Joseph-son, in March of 1986, saying that he intended to grandfather Providence's project. However, since this letter was written nearly three years *after* the legislative debate, it adds nothing to legislative history:

> [S]ubsequent testimony of even the prime sponsor of a bill as to either his own understanding or the legislature's understanding of the meaning of the bill should not be considered by a court in construing legislative intent. We do not wish to transform statutory construction into a parade of legislators' affidavits containing their perceptions of the meaning of a bill.

*Alaska Public Employees' Ass'n v. State,* 525 P.2d 12, 16 (Alaska 1974) (footnote omitted).[7] Furthermore, even if, in June of 1983, Senator Josephson did intend to include Providence's project in the grandfather clause, he may have assumed that Providence would *apply* for the aid prior to July 26, 1983, the effective date of repeal.

Statements made by a governor, in transmitting a signed bill back to the legislature, can also be considered by a court when determining legislative intent. *See* C. Sands, Statutory Construction § 48.05, at 305–06 (4th ed., rev.1984). In this case, Governor Sheffield's transmittal letter stated: "It is appropriate that existing facilities, under construction, be grandfathered, but no others." At first glance, this language might be seen as supporting Providence's view that *any* hospital under construction was entitled to the funds, whether or not it applied for the aid. However, the Governor did not sponsor the bill. Accordingly, his letter, containing only the single, general sentence quoted above, reflects no more than his understanding of the intent of the grandfather clause. Some

---

**6.** We do not believe that "entitled" is always used in this sense. Some courts have felt that their respective legislatures used "entitled" in an informal sense, synonomous with "eligible" or "qualified." Such holdings occur in the context of government retirement plans, where there is an element of reliance on the benefits—reliance deliberately induced by the government. Laws relating to such plans are generally liberally construed. *See, e.g., Merrill v. United States,* 338 F.2d 372, 374, 168 Ct.Cl. 1 (1964); *Litchfield v. Retirement Board of Middlesex County,* 303 Mass. 473, 21 N.E.2d 973 (1939). We distin-guish those cases from the one before us today, in which Providence has shown no reliance on prospective state funding.

**7.** So too, in *Lynden Transport, Inc. v. State,* 532 P.2d 700, 716 (Alaska 1975), the court stated: "When a law has been enacted, the legislature has spoken as a whole, and the recollections of an individual legislator as to what was intended are irrelevant to a determination of legislative intent."

weight may be given to that single sentence, but not much. *Compare State, Div. of Agric. v. Fowler*, 611 P.2d 58, 60 (Alaska 1980) (in which we gave considerable weight to the governor's statement of intent in a transmittal letter accompanying a bill the governor sponsored).

In Providence's memorandum to the DCRA, the hospital pointed out two additional points of legislative history.[8] First, the President of the Alaska Hospital Association, testifying on the proposed repeal at a House Finance Committee meeting, indicated that the repeal of AS 29.90 would preclude Providence from getting the subsidy.[9] Second, in a letter to Senator Ferguson dated March 21, 1983, Senator Josephson indicated that he thought the repeal of AS 29.90 would render Providence ineligible for the subsidy. Providence correctly points out that both of these comments were made prior to the granting of the hospital's certificate of need on May 2, 1983, and therefore prior to the time construction legally could have begun. Thus, by the time the repeal was actually enacted, the comments could have been outdated.

In short, the legislative history does not clearly reflect the legislature's intended meaning of "entitled to receive."

### C. Policy considerations

Sound policy supports our view that Providence was not "entitled to receive" funding under the grandfather clause.

First, it would certainly have been sensible, in repealing the aid program, for the legislature to have desired to fix the recipients to be included in the grandfather clause. On July 25, 1983, the legislators could easily determine exactly which hospitals had applied for the subsidy. It is considerably less likely that the legislature would have voted to retain unknown liabilities that might not become apparent for years.

Second, if this court adopts a relaxed definition of "entitled" that does not require going through the application process, then the next question is whether Providence had actually begun construction prior to the July 26, 1983 repeal. This is a factual inquiry with a host of subsidiary issues: Would spending *any* amount of money on the project, no matter how trivial, be sufficient? Does purchasing and installing trailers count? Should all project costs be considered "construction" costs? This was exactly the type of factual dispute that the legislature probably sought to avoid. More sensibly, we believe that the legislature sought to choose a bright-line criterion for determining which projects would be grandfathered—namely, whether an application for the funding had been at least submitted, if not accepted, by July 25, 1983.

Third, by its terms, the repeal of AS 29.90 indicated a legislative desire that construction subsidies not be automatic. Rather, future construction subsidies would occur only by appropriation on a case-by-case basis. Minutes, Senate Finance Committee Meeting, June 17, 1983, 8:30 a.m. (consideration of SB 8). It would certainly have been consistent with this intent to grandfather only those projects for which funding requests had already been submitted.

If approval of an application for funding were automatic, this court might be reluctant to place undue legal weight on the routine step of submitting an application. Approval, however, is not automatic. First, as part of the application, the hospital sponsor must submit an estimated total project cost, certified by the governing body. 19 AAC 30.061(a)(3). (Eff. 8/20/81) Second, DCRA must review the application for conformance with certain standards. 19 AAC 30.061(a) (Eff. 8/20/81). For example, no aid will be granted unless the Commissioner of Health and Social Services certifies to DCRA that the hospital's assets are "dedicated irrevocably to a pub-

---

**8.** These were not included in the appellate record.

**9.** The language of the grandfather clause under consideration was identical to the clause actually enacted.

lic purpose." 19 AAC 30.061(a)(1) (Eff. 8/20/81). Third, DCRA must determine whether construction began before the date of repeal of the aid program.[10] Then, the Director of the Division of Municipal and Regional Assistance will make a "final determination of the amount of aid to which the applicant is entitled." 19 AAC 30.-091(b) (Eff. 8/20/81). The applicant may appeal the determination to the commissioner. "The appeal must include the relevant evidence in support of the applicant's claim." 19 AAC 30.101(a) (Eff. 8/20/81). After making the final determination, DCRA will "mail to an applicant a final notice containing a statement of the payment the applicant is *entitled to receive.*"[11] 19 AAC 30.111 (Eff. 8/20/81) (emphasis added).

This entire process is far from being a mere formality. It involves the presentation of evidence by the applicant, and the review of that evidence by the agency.

### III.

 While "entitled" may once have been synonymous with "eligible," today it is not. This is an age of statutory entitlements, in which "entitled" is used as a formal legal term even in common parlance. It is unlikely that the legislature picked it carelessly.

As a matter of statutory interpretation, we hold that Providence was not "entitled to receive" aid prior to July 26, 1983 because it had not submitted an application by that date.[12] We need not decide whether submitting an application would have been enough, or whether Providence would have been entitled to the aid only if the DCRA had reviewed the application and accepted it by that date. We REVERSE the superior court's decision.

10. In Providence's case, this proves to be a thorny issue.

11. At first glance, it seems significant that the legislature, in the grandfather clause of the repealing legislation, chose words identical to the words in the regulation—namely, "entitled to receive." This might be seen as strong evidence that the legislature intended the entitlement to arise only upon receipt of the final notice from

MATTHEWS, Chief Justice, concurring.

I agree with the conclusion that the appellee was not "entitled to receive" state construction aid prior to July 26, 1983, because it had not even submitted an application for aid as of that date. I do not join in Part II C of the opinion, however, discussing policy considerations, because in my view this discussion is neither persuasive nor necessary.

DCRA. But this argument is not conclusive: one could argue that both the statute and the regulations should be read as referring to an entitlement that arose *prior* to the adjudication process.

12. Accordingly, we do not reach the other issues raised in this case, which include waiver, estoppel, statute of limitations, and procedural error.